IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

BETTY TINSLEY,

                      Plaintiff,

v.                                CIVIL ACTION NO.   3:13-23241

ONEWEST BANK, FSB, D.B.A
FINANCIAL FREEDOM,

                      Defendant.

### MEMORANDUM OPINION AND ORDER

Pending is Defendant's Motion to Dismiss, ECF No. 12, and Plaintiff's Motion Requesting Hearing on Defendant's Motion to Dismiss, ECF No. 26. Defendant's Motion to Dismiss is **GRANTED in part** and **DENIED in part**. Plaintiff's breach of contract claim that Defendant required Plaintiff to get flood insurance in excess of what was required under the Deed of Trust, force-placed such insurance, and charged the cost to Plaintiff survives this Motion to Dismiss. Plaintiff's WVCCPA claims that Defendant violated West Virginia Code §§ 46A-6-104 and -102(L) by 1) implying to Plaintiff that she was required under company regulations and federal law to purchase additional flood insurance and 2) twice threatening to foreclose on Plaintiff's property if she did not pay a "property charge" of $1,369.70 also survive this Motion to Dismiss. All other claims—including Plaintiff's other breach of contract claim, all of Plaintiff's fraud and intentional misrepresentation claims, all of Plaintiff's other WVCCPA claims, all of Plaintiff's intentional infliction of emotional distress claims, and all of Plaintiff's negligence or reckless or negligent misrepresentation claims—are **DISMISSED**.

Plaintiff's Motion Requesting Hearing is **DENIED as moot**.

## I.      Background

In August 2013, Plaintiff filed the instant case in the Circuit Court of Putnam County, West Virginia. On September 19, 2013, Defendant removed the case to this Court, and on October 9, 2013, Plaintiff filed a Second Amended Complaint[1] (hereinafter, "Complaint"), seeking compensatory damages, statutory damages, punitive damages, attorneys' fees, and court costs and alleging breach of contract, fraud, intentional misrepresentation, violations of the West Virginia Consumer Credit and Protection Act ("WVCCPA"), intentional infliction of emotional distress, negligence, and reckless or negligent misrepresentation, in connection with a reverse mortgage entered into by Plaintiff and Defendant's predecessor.

In her Complaint, Plaintiff specifically alleges that the Home Equity Conversion Loan Agreement[2] which she entered into with Financial Freedom Senior Housing Funding Corporation—the direct predecessor to Defendant Financial Freedom—states,

> Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plain [sic] (Exhibit 1) to be applied to payment due for a fixed monthly charge for servicing activities of Lender or its servicer. Such servicing activities are necessary to protect Lender's interest in the Property. A servicing fee set aside, if any, is not available to the Borrower for any purpose, except to pay for loan servicing.

Compl. ¶ 30, ECF No. 8. According to Plaintiff, the Agreement provides for a servicing fee set aside of $5,180.17; however, Plaintiff alleges that the parties did not contract for a particular servicing fee amount and that she was never given notice that she would be paying a set monthly servicing fee. Plaintiff alleges that, for the duration of the loan (March 2008 to present), Defendant has charged her a monthly $30 servicing fee. She alleges that this fee, alone, has resulted in

---

[1] It appears that a First Amended Complaint was filed in this case before it was removed to this Court.
[2] Paragraph 30 of the Complaint labels this Agreement "Exhibit 1"; however, no exhibits are attached to the Complaint.

approximately $1,920 in monthly servicing charges ($360 a year), on top of the following interest charges: $1,189.42 in 2008, $1,032.59 in 2009, $1,014.78 in 2010, and $1,012.40 in 2011.

Plaintiff further alleges that the Agreement provides that "the lender is to withhold from each monthly payment an amount to pay . . . (c) premiums for fire, flood, and other hazard insurance as required by the Security Agreement." *Id.* ¶ 6. Plaintiff alleges that the First Deed of Trust—benefitting Defendant "Financial Freedom"—states in small lettering, under the label "Fire, Flood and Other Hazard Insurance," that the "Borrower shall also insure all improvements on the Property, whether now in existence of [sic] subsequently erected, against loss by floods to the extent required by the Secretary." *Id.* ¶ 7. Additionally, according to Plaintiff, the Second Deed of Trust—benefitting the Department of Housing and Urban Development ("HUD")—states in small lettering, under the label "Fire, Flood and Other Hazard Insurance," that the "Borrower shall insure all improvements on the Property, whether now in existence of [sic] subsequently erected, against loss by floods to the extent required by the lender." *Id.* ¶ 8. Plaintiff states that she presumes this to be the amount required by the Secretary of HUD, based upon the above statement in the First Deed of Trust.

Plaintiff further alleges that, on March 19, 2008, in consideration for the First Deed of Trust, she borrowed approximately $41,818 from Defendant and that, on January 31, 2008, her residence appraised for $111,000. As of May 2013, Plaintiff alleges that the outstanding balance on the reverse mortgage is $83,904.48.

Plaintiff alleges that she had adequate flood insurance through Jim Lively Insurance from March 21, 2010, through March 21, 2011, in the amounts of $100,100 for buildings and $6,800 for contents, with a $2,000 deductible; and that this policy was nearly identical to the policy she had

with the same insurer from March 21, 2009, to March 21, 2010—the only difference being that the deductible was $1,000 on the older policy.

Plaintiff alleges that, on or about April 6, 2010, Defendant sent her a letter informing her that her flood insurance policy was inadequate and that she needed an additional $149,900 in flood insurance, which would have brought her flood insurance coverage up to the maximum amount allowable under HUD rules.[3] The letter allegedly states,

> Your mortgage documents and federal law authorize us to require that adequate flood insurance be maintained with respect to all outstanding loans secured by improved property located in a Special Flood Hazard Area ["SFHA"] . . . . Your property is located in an SFHA, so the terms of your mortgage and federal law require you to purchase adequate flood insurance. Our records show that we have not received proof that adequate flood insurance is in force on your property. As a result, if we do not receive proof that you have adequate flood insurance for the property, we will purchase the additional flood insurance (lender-placed insurance) required and charge you for the cost of the insurance. . . . Coverage must be in an amount that is at least equal to, (i) the last known amount of homeowners insurance (Coverage A) that you purchased or (ii) the maximum available coverage under the National Flood Insurance Program (NFIP), (currently $250,000 for residential properties in participating communities), whichever is lowest.

*Id.* ¶ 16. Plaintiff further alleges that, on or about March 21, 2010, Defendant force-placed a second flood insurance policy—for $100,000—on her property through the Lexington Insurance Company and that this policy carried a premium of $516.25, which was charged to Plaintiff's line of credit.

Plaintiff alleges that, on multiple occasions, she requested information from Defendant to explain why this insurance was force-placed. In a letter dated April 26, 2011, Plaintiff alleges that she was again informed that her previous insurance was inadequate and that, because of her failure

---

[3] 24 C.F.R. § 203.16a(c)—promulgated by HUD—states that, when flood insurance is required, it "must be maintained during such time as the mortgage is insured in an amount at least equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvements, whichever is less." This same letter from Defendant is quoted in the Complaint as saying, "[T]he maximum available coverage under the National Flood Insurance Program (NFIP) . . . [is] currently $250,000 for residential properties in participating communities." Compl. ¶ 16.

to get adequate insurance, Defendant force-placed insurance for $181,000 with a premium of $1,801.20, which was again charged to Plaintiff's equity. Plaintiff alleges that $181,000 was $28,747.16 more than *double* the outstanding mortgage balance of $76,126.42 in April 2011 and that HUD required only coverage sufficient to cover the outstanding balance.

Plaintiff alleges that, in 2011, she filed a complaint with the Attorney General, based, in part, upon Defendant's practice of force-placing excessive flood insurance and depleting her equity with the cost of the premiums. Plaintiff further alleges that, in a response letter to the Attorney General, V. Lyn Niles, Vice President of Loan Administration for Defendant Financial Freedom, stated:

> We recently updated our flood policy to accept coverage for the lesser of the improved value (i.e., the dwelling(s)) of the property based on the appraisal or the maximum allowed by the National Flood Insurance program. As such, the minimum flood coverage amount required is now $91,000 (appraised value of $111,000 less a site (land) value of $20,000).

*Id.* ¶ 23. Then, Plaintiff alleges, on March 21, 2012, Defendant force-placed flood insurance on her property for just $91,000, again through the Lexington Insurance Corporation, for the period of March 21, 2012, through March 21, 2013, and provided Plaintiff with notice of the insurance placement. The premium amount of $918.41 was charged to Plaintiff's equity.

However, Plaintiff alleges, Defendant next, through a letter dated April 12, 2012, sent Plaintiff notice that it was force-placing flood insurance on her property in the amount of $182,000,[4] again through the Lexington Insurance Corporation and again for the period of March 21, 2012, through March 21, 2013. The premium amount of $1,811.01 was also to be charged to Plaintiff's equity. Plaintiff further alleges that, in June 2012, the outstanding balance on the loan was $78,248.60; thus, $181,000 remained more than double the outstanding loan balance.

---

[4] Given the immediately following allegation in paragraph 26 of the Complaint ("[T]hus $181,000 of insurance was still more than twice the outstanding loan balance . . . ."), this amount may actually be $181,000.

Plaintiff alleges that, on June 18, 2013, her counsel mailed a 20 day notice of right to cure letter to Defendant's Repayment Department. The letter was signed for by Darryl Mize. In the letter, Plaintiff alleged violations of West Virginia consumer laws and provided Defendant with 20 days to cure those violations, including refunding all monies used over and above what was necessary for force-placed flood insurance. Plaintiff alleges that Defendant wrote a response on July 12, 2013, stating that 1) Plaintiff's new flood insurance for $84,000 was acceptable and that she could ignore a letter mailed to her on July 7, 2013, requesting an additional $100,000 in flood insurance and 2) the new force-placed policy was cancelled, resulting in a $1,374.06 refund to Plaintiff's equity. However, Plaintiff alleges that, on July 16, 2013, Defendant sent her another letter informing her that she needed to purchase an additional $100,000 in flood insurance.

Plaintiff further alleges that, by letter dated March 27, 2013, and titled "Repayment Agreement," Defendant informed Plaintiff that her reverse mortgage was "suspended and in default status." *Id.* ¶ 35. Plaintiff alleges that the letter further states,

> As stated in your reverse mortgage loan documents, you must pay your property charges timely. Your failure to do so has resulted in Financial Freedom advancing funds on your behalf, which must be repaid. The totally repayment amount is $1,369.70. . . . If the default remains unresolved, this may result [sic] the initiation of proceedings to foreclose and ultimately the loss of your home.

*Id.* ¶¶ 36-37. Plaintiff states that it is unclear for what reason the referenced funds were advanced but that she presumes that such advance was for the force-placed flood insurance. The letter further demands payment of $1,369.70 by April 29, 2013, or suggests a payment plan of $114.15 per month for one year. Plaintiff states that an identical letter was sent again by Defendant on May 27, 2013.

Count I alleges breaches of contract by Defendant for 1) force-placing insurance in excess of what was required under the Deed of Trust and charging the cost of such insurance to Plaintiff, and 2) charging Plaintiff a monthly $30 servicing fee which was not clearly disclosed to her.

Count II alleges fraud and intentional misrepresentation by Defendant for 1) demanding that Plaintiff obtain excessive additional flood insurance and force-placing such insurance, 2) informing Plaintiff that her flood insurance was inadequate and that she had an obligation to carry flood insurance in excess of the loan balance, 3) failing to adequately explain the monthly $30 servicing fee to Plaintiff, and 4) threatening to foreclose on Plaintiff's property for a vague "property charge" of $1,369.70.

Count III alleges violations of the WVCCPA by Defendant for 1) misleading Plaintiff in multiple letters by stating that her flood insurance was inadequate, 2) implying to Plaintiff that she was required under company regulations and federal law to purchase additional flood insurance, 3) failing to adequately disclose to Plaintiff the reasoning for and amount of the monthly servicing fee and how it would be charged to her account, 4) twice threatening to foreclose on Plaintiff's property if she did not pay the "property charge" of $1,369.70, 5) charging Plaintiff for flood insurance which was of no practical value to her, 6) requiring flood insurance which was not reasonably related to the existing hazard or risk of loss or to the terms of credit provided to Plaintiff by Defendant, and 7) not allowing Plaintiff to choose the flood insurance provider.

Count IV alleges intentional infliction of emotional distress by Defendant for 1) misleading Plaintiff regarding the amount of flood insurance she needed, 2) force-placing excessive flood insurance on Plaintiff's residence, costing her thousands of dollars in equity, 3) implying that federal law required Defendant to force-place such excessive insurance, and 4) twice

threatening to foreclose on Plaintiff's property if she did not pay the vague "property charge" of $1,369.70.

Count V alleges negligence or reckless or negligent misrepresentation by Defendant for 1) failing to train, supervise, monitor, or otherwise control its employees a) to ensure that they did not violate the WVCCPA and b) to ensure that their flood insurance policies were in compliance with the terms of the Deed of Trust and federal law, 2) representing to Plaintiff that she was not in compliance with federal regulations and her contractual agreement with Defendant because of her flood insurance policy, and 3) twice threatening Plaintiff with foreclosure for undefined property charges.

Defendant filed the instant Motion to Dismiss on November 8, 2013. Plaintiff filed her timely Response, ECF No. 17, and Defendant filed a timely Reply, ECF No. 20. On February 12, 2014, Defendant filed a Supplement to its Reply, ECF No. 29, and Plaintiff filed a concomitant supplement to her Response, ECF No. 30. This Motion is ripe for resolution.

## II.    Standard

When considering a motion to dismiss, 1) a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then 2) "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

For the first step, the complaint must provide the plaintiff's "grounds of . . . entitlement to relief" in more factual detail than mere "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). "[A] formulaic recitation of the elements

of a cause of action will not do." *Id.* at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

For the second step, a court must take the factual allegations in the complaint as true, and the complaint must be viewed in the light most favorable to the plaintiff. *See Twombly*, 550 U.S. at 555-56. The complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 555, 570 (internal quotation marks omitted). Plausibility is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted).

## III.  Analysis

### a.  Consideration of Outside Documentation

In support of its instant Motion to Dismiss under Rule 12(b)(6), Defendant attaches a Home Equity Deed of Trust, dated March 19, 2008, between Plaintiff and Financial Freedom Senior Funding Corporation. ECF No. 13-2. In her Response, Plaintiff references twenty-two exhibits of her own. Plaintiff's Exhibit 21 is the same Deed of Trust that Defendant attached to its Motion. ECF No. 17-11. Plaintiff also reattaches Exhibit 22 from her Response to her Supplemental Response.

Federal Rule of Civil Procedure 12(d) states:

If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

The Fourth Circuit has clarified that a motion to dismiss under Rule 12(b)(6) will not automatically convert into a motion for summary judgment under Rule 56 simply because the parties present materials outside of the pleadings. *Finley Lines Joint Protective Bd. Unit 200, Bhd. Ry. Carmen, a Div. of Transp. Commc'ns Union v. Norfolk S. Corp.*, 109 F.3d 993, 996-97 (4th Cir. 1997). Instead, in order to complete such a conversion, "the district court [must] . . . indicat[e] that it will not exclude from its consideration of the motion the supporting extraneous materials." *Id.* at 997.

Without converting a motion to dismiss into a motion for summary judgment, a court may consider documents attached to the complaint pursuant to Rule 10(c), which states, in pertinent part, "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Additionally, the court may consider documents extrinsic to the complaint if they are "integral to and explicitly relied on in the complaint" and if there is no dispute as to their authenticity. *See Robinson v. Am. Honda Motor Co.,* 551 F.3d 218, 222–23 (4th Cir. 2009) (analyzing extrinsic evidence presented by both parties in the context of a motion to dismiss using the same standard); *see also Branin v. TMC Enterprises, LLC*, 832 F. Supp. 2d 646, 649 (W.D. Va. 2011); *Fisher v. Maryland Dep't of Pub. Safety & Corr. Servs.*, No. JFM-10-CV-0206, 2010 WL 2732334, at *2 n.2 (D. Md. July 8, 2010) (noting that "[t]he same standard applies to documents attached to a plaintiff's response in opposition" (citing *Robinson,* 551 F.3d at 222–23)). This does not mean that all documents merely referenced in a complaint can automatically be considered in the context of a motion to dismiss:

> [R]ather, . . . the referenced document [must] be central or integral to the claim in the sense that its very existence, and not the mere information it contains, gives rise to the legal rights asserted. The cases illustrate this requirement. Thus, where a complaint in a fraud action references a document containing the alleged material misrepresentations, the referenced document may be considered part of the complaint. Similarly, a newspaper article reporting allegedly fraudulent statements by a corporate officer may be considered part of the complaint in a securities fraud

action, and an allegedly libelous magazine article referred to in a complaint may be considered part of the complaint in a libel action based on that article.

*Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007) (footnotes omitted).

When a document is properly considered in the context of a motion to dismiss and it conflicts with the bare allegations of the complaint, the document prevails. *Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp. 2d 678, 683 (D. Md. 2001); *see Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

Here, the Home Equity Deed of Trust which both Defendant and Plaintiff attach to their briefing is properly considered by the Court in its resolution of the instant Motion to Dismiss because it is integral to and explicitly relied upon in the Complaint, and there is no dispute as to its authenticity. Though Plaintiff did not attach the Deed to her Complaint as an exhibit, she quoted it in paragraph 7 of her Complaint—as the "First" Deed of Trust—, and the Deed gives rise to Plaintiff's breach of contract claim.

The remaining evidentiary exhibits which Plaintiff attaches to her Response and to the Supplement to her Response are more problematic. Only nine of the exhibits to Plaintiff's Response are explicitly referenced in the Complaint, and none of them were attached to her Complaint or referenced therein as an exhibit to the Complaint. The Court will examine each of the nine exhibits explicitly referenced in the Complaint in turn.

Plaintiff's Exhibit 5, ECF No. 17-5, is comprised of the first page of a letter from Defendant to Plaintiff, dated April 26, 2011, reminding her that it may need to force-place insurance on her property and disclosing various information regarding force-placing insurance. This letter is referenced in paragraph 19 of the Complaint: "[Plaintiff] was informed that her previous insurance was for an inadequate amount, by letter dated April 26, 2011, [sic] the Defendant informed the Plaintiff that because of her failure to get insurance for the very high and

unaffordable amount they were demanding, they force placed insurance for $181,000 with a premium of $1,801.20." The portion of the letter attached as an exhibit does not contain the information referenced in the Complaint and does not give rise to any of Plaintiff's claims. Thus, Exhibit 5 is not integral to the Complaint.

Plaintiff's Exhibit 6, ECF No. 17-6, is comprised of the first two pages of a letter from Defendant to Plaintiff, dated July 16, 2013, stating, among others things, that Plaintiff's mortgage documents and federal law authorize Defendant to require that adequate flood insurance be maintained with respect to Plaintiff's property. This letter is referenced in paragraph 29 of the Complaint: "On July 16, 2013, the Defendant sent [Plaintiff] a new letter informing her that she needed to purchase an additional $100,000 in additional flood insurance." Though the reference in the Complaint does not clearly state the importance of this letter, it nonetheless is one of the communications from Defendant which gives rise to Plaintiff's fraud and intentional misrepresentation, WVCCPA, intentional infliction of emotional distress, and negligence or reckless or negligent misrepresentation claims. Thus, Exhibit 6 is integral to the Complaint, and since the authenticity of the exhibit is not contested, the Court may properly consider it in resolving the instant Motion to Dismiss.

Plaintiff's Exhibit 7, ECF No. 17-7, is comprised of a letter from Defendant to Plaintiff, dated July 7, 2013, also stating, among others things, that Plaintiff's mortgage documents and federal law authorize Defendant to require that adequate flood insurance be maintained with respect to Plaintiff's property. This letter is referenced in paragraph 28 of the Complaint: "The Defendant wrote a formal response on July 12, 2013 stating that [Plaintiff's] new flood insurance for $84,000 was acceptable and that she could ignore a letter mailed to her on July 7, 2013 requesting an additional $100,000 in flood insurance." As with Exhibit 6, this letter is one of the

communications from Defendant which gives rise to Plaintiff's fraud and intentional misrepresentation, WVCCPA, intentional infliction of emotional distress, and negligence or reckless or negligent misrepresentation claims. Thus, Exhibit 7 is integral to the Complaint, and since the authenticity of the exhibit is not contested, the Court may properly consider it in resolving the instant Motion to Dismiss.

Plaintiff's Exhibit 22, ECF No. 17-12, is comprised of a letter from Defendant to a mediator from the Consumer Protection and Antitrust Division of West Virginia's Office of the Attorney General, dated May 5, 2011, addressing multiple concerns Plaintiff brought to the mediator's attention. This letter is referenced in paragraph 23 of the Complaint. Only one section of the letter refers to the flood insurance dispute that is part of the instant case, and the majority of that section is solely informational, in that it recounts prior events or explains current or prior policies, definitions or actions. One portion of this section is more difficult to categorize as "integral" to Plaintiff's claims or not:

> We recently updated our flood policy to accept coverage for the lesser of the improved value (i.e., the dwelling(s)) of the property based on the appraisal or the maximum allowed by the National Flood Insurance program. As such, the minimum flood coverage amount required is now $91,000 (appraised value of $111,000 less a site (land) value of $20,000). To reiterate, Ms. Tinsley's policy coverage through 3/21/11 of $181,000 is acceptable. Since this policy has expired, Ms. Tinsley needs to obtain a new policy and if she desires she may reduce her flood coverage to no less than $91,000 for this new policy. The additional flood coverage Financial Freedom purchased has been cancelled and a refund of $251.78 will be applied to Ms. Tinsley's loan within the next two weeks. As a reminder, Ms. Tinsley's current flood policy expired on March 21, 2011 and evidence of a new policy with a coverage amount no less than $91,000 is needed or we must again force place a policy and charge the premium to her loan balance. This will cause her loan to be in default and could result in her loan becoming due and payable.

Letter from V. Lyn Niles, Vice President of Loan Admin., Financial Freedom, to Dennis P. Cunningham, Mediator, Consumer Prot. & Antitrust Div., State of W. Va. Office of the Att'y Gen., at *4 (May 5, 2011). Only two of Plaintiff's claims come close to implicitly requiring the

above portion of Exhibit 22. In the second paragraph 17 of the Complaint,[5] Plaintiff alleges that "Defendant violated WVCCPA §46A-3-109(a)(b)(4) by providing misleading and unclear statements of what [sic] how much flood insurance was required . . ." and in the second paragraph 24, Plaintiff alleges that "Defendant negligently failed to train, supervise, monitor or otherwise control its employees to ensure that its employees did not violate the WVCCPA . . . ." Though the above portion of Exhibit 22 could potentially be used by Plaintiff as partial evidence in support of these two claims, this Court does not find that it is integral to the claims in a way which gives rise to them.

Plaintiff's Exhibit 25, ECF No. 17-15, is comprised of a letter from Plaintiff's counsel to Defendant, dated June 18, 2013, and entitled "Notice of Right to Cure under 46A-6-106 of the West Virginia Consumer Credit and Protection Act," and a U.S.P.S. certified mail return receipt. The letter is referenced in paragraph 27 of the Complaint, but it does not give rise to any of Plaintiff's claims. Thus, Exhibit 25 is not integral to the Complaint.

Plaintiff's Exhibit 26, ECF No. 17-16, is comprised of a letter from Defendant to Plaintiff's counsel, dated July 12, 2013, the majority of which is solely informational, in that it recounts prior events or explains current or prior policies, definitions or actions. The letter is referenced in paragraph 28 of the Complaint. One portion of the letter states,

> Ms. Tinsley may disregard our letter dated July 7, 2013 informing her that she needed to purchase an additional amount of flood coverage for $100,000 (GAP coverage). We have requested our insurance vendor change the required amount of flood coverage to $84,000 effective March 21, 2013 and this will result in an additional credit to the loan for an amount to be determined. Since the National Flood Insurance Program (NFIP) flood policy was not effective until June 20, 2013 the gap in coverage will still need to be covered by the lender-placed policy at the $84,000 coverage amount rather than $184,000.

---

[5] The Complaint begins renumbering at paragraph 1 again under Count I.

-14-

Letter from Thea Olson, Customer Experience Analyst, Fin. Freedom, to Benjamin Sheridan, Esq., at *2 (July 12, 2013). Like Exhibit 22, this portion of Exhibit 26 could potentially be used by Plaintiff as partial evidence in support of the two claims outlined above regarding "misleading and unclear statements of what how much flood insurance was required." Also like Exhibit 22, the Court does not find that this portion of Exhibit 26 is integral to these claims in a way which gives rise to them.

Plaintiff's Exhibit 27, ECF No. 17-17, is comprised of a letter from Defendant to Plaintiff, dated March 27, 2013, and entitled "Repayment Agreement," which informs Plaintiff that her loan is suspended and in default status, states what this means and what action Defendant wishes Plaintiff to take in response, and states that this can ultimately lead to foreclosure of Plaintiff's home. This letter is referenced in paragraphs 35 through 38 of the Complaint, and it is one of the communications from Defendant which gives rise to Plaintiff's fraud and intentional misrepresentation, WVCCPA, intentional infliction of emotional distress, and negligence or reckless or negligent misrepresentation claims. Thus, Exhibit 27 is integral to the Complaint, and since the authenticity of the exhibit is not contested, the Court may properly consider it in resolving the instant Motion to Dismiss.

Plaintiff's Exhibit 28, ECF No. 17-18, is comprised of a letter from Defendant to Plaintiff, dated May 27, 2013, and entitled "Repayment Agreement: Final Notice," which duplicates the content of Exhibit 27. This letter is referenced in paragraph 39 of the Complaint, and it is also one of the communications from Defendant which gives rise to Plaintiff's fraud and intentional misrepresentation, WVCCPA, intentional infliction of emotional distress, and negligence or reckless or negligent misrepresentation claims. Thus, Exhibit 28 is integral to the Complaint, and

since the authenticity of the exhibit is not contested, the Court may properly consider it in resolving the instant Motion to Dismiss.

In summary, the Court will consider Defendant's Exhibit B—the Deed of Trust—and Plaintiff's Exhibits 6, 7, 21—also the Deed—, 27, and 28 in resolving the instant Motion to Dismiss. The Court will not convert this Motion into a Motion for Summary Judgment before hardly any discovery has been completed in the case, without a complete collection of exhibits from both parties, and without the request of either party that this Motion be treated as such. Thus, all of Plaintiff's other exhibits will not be considered by the Court.

### b.   Preemption

Defendant argues that all of Plaintiff's claims are preempted by the Home Owners' Loan Act ("HOLA"), 12 U.S.C. §§ 1461 *et seq.*, and its implementing regulation, 12 C.F.R. § 560.2.

HOLA granted the Office of Thrift Supervision ("OTS") the authority to regulate federal savings associations,[6] and though HOLA, itself, does not define its preemptive effect, the implementing regulation promulgated by OTS states that the agency "occupies the entire field of lending regulation for federal savings associations."[7] *McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 554 (4th Cir. 2013); 12 C.F.R. § 560.2(a). Importantly, "a federal regulation has the same preemptive effect as a federal statute." *McCauley*, 710 F.3d at 554.

The implementing regulation, 12 C.F.R. § 560.2, goes on to state that "federal savings associations may extend credit . . . without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section." §

---

[6] Defendant asserts that Plaintiff's loan was originated by an operating subsidiary of a federally-chartered savings association. Def.'s Mem. Supp. Mot. Dismiss 4 n.3. Plaintiff appears to concede this point by arguing that her state law claims are not preempted under HOLA, not that HOLA does not apply in the first place.

[7] The Dodd–Frank Wall Street Reform and Consumer Protection Act—signed into law in 2010—abolished OTS. 12 U.S.C. §§ 5412, 5413. However, it did not retroactively vacate the regulations issued by OTS. *McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 554 n.2 (4th Cir. 2013). Thus, since the key regulation regarding state law preemption under HOLA, 12 C.F.R. § 560.2, was in effect when the parties entered into the Deed in 2008, it governs here. *See also id.*

-16-

560.2(a). Paragraph (b) of the regulation then specifies that the types of state laws preempted by

HOLA include, "without limitation," state laws[8] "purporting to impose requirements regarding":

> (1) Licensing, registration, filings, or reports by creditors;
> (2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements;
> (3) Loan-to-value ratios;
> (4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;
> (5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;
> (6) Escrow accounts, impound accounts, and similar accounts;
> (7) Security property, including leaseholds;
> (8) Access to and use of credit reports;
> (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;
> (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;
> (11) Disbursements and repayments;
> (12) Usury and interest rate ceilings to the extent provided in 12 U.S.C. 1735f–7a and part 590 of this chapter and 12 U.S.C. 1463(g) and § 560.110 of this part; and
> (13) Due-on-sale clauses to the extent provided in 12 U.S.C. 1701j–3 and part 591 of this chapter.

§ 560.2(b). Finally, paragraph (c) states that certain types of state law—including contract and

commercial law, real property law, and tort law—"are not preempted to the extent that they only

incidentally affect the lending operations of Federal savings associations or are otherwise

consistent with the purposes of paragraph (a) of this section."[9] § 560.2(c). OTS has further

---

[8] For the purposes of § 560.2, "'state law' includes any state statute, regulation, ruling, order or judicial decision." § 560.2(a).

[9] Paragraph (a) states the following purposes: "to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States," "[t]o enhance safety and soundness and to enable federal savings associations to conduct their operations . . . by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden," "to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation," and "to further other purposes of [] HOLA." 12 C.F.R. §

clarified that "the purpose of paragraph (c) is to preserve the traditional infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations." Lending & Investment, 61 Fed. Reg. 50951–01, 50966 (Sept. 30, 1996).

OTS has also specified the analysis a court should undergo to determine whether preemption applies:

> When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption.

*Id.* at 50966-67. The Fourth Circuit has clarified that, "[i]n considering § 560.2(b), . . . [a court] must look to all the acts alleged in the complaint. . . . [This] requires an examination of each component of [a] claim to determine if it purports to regulate those aspects of loans enumerated in § 560.2(b)." *McCauley*, 710 F.3d at 556 (citation omitted) (internal quotation marks omitted).

Using this framework, the Court will review each of Plaintiff's claims in turn.

### i. Count I: Breach of Contract

Count I alleges breaches of contract by Defendant for 1) "requir[ing]" Plaintiff to get flood insurance in excess of what was required under the Deed of Trust,[10] force-placing such insurance, and charging the cost to Plaintiff and 2) charging Plaintiff a monthly $30 servicing fee which was

---

560.2(a).

[10] The issue of whether Defendant's flood insurance requirements or the ultimately force-placed insurance is plausibly alleged to be "in excess" of what is required by the Deed of Trust is dealt with below. Preemption analysis focuses upon whether each claim, assuming it to be adequately alleged, must be preempted, not whether the Complaint adequately alleges sufficient facts to plausibly give rise to the claim.

not clearly disclosed "on any of the paperwork from the date of closing the loan . . . to [the] present." Compl. 8 ¶¶ 3-4 (2nd).

Plaintiff's first claim properly alleges a breach of contract, in that the claim arises out of the Deed of Trust and does not attack any of Defendant's underlying policies or practices. *See Bishop v. Ocwen Loan Servicing, LLC*, No. CIV.A. 3:10-0468, 2010 WL 4115463, at *5 (S.D. W. Va. Oct. 19, 2010). A breach of contract claim is a prime example of the type of claim which arises from "the traditional infrastructure of basic state laws that undergird commercial transactions." Lending & Investment, 61 Fed. Reg. at 50966. As such, the law out of which this claim arises is not one of the types of law listed under § 560.2(b); instead, it falls within the confines of "contract and commercial law" under § 560.2(c). Though a breach of contract claim such as this affects the lending operations of federal savings associations, it does so only incidentally, and the bringing of such a claim under state law remains consistent with the purposes of § 560.2(a). *See Bishop*, 2010 WL 4115463, at *5, 7. Thus, Plaintiff's claim that Defendant required Plaintiff to get flood insurance in excess of what was required under the Deed of Trust and force-placed such insurance, charging the cost to Plaintiff, is not preempted under HOLA.

Though Defendant's second claim is also identified in the Complaint as a "breach of contract" claim, it does not, in fact, allege a breach of the terms of the Deed. Instead, Plaintiff alleges that Defendant did not clearly *disclose* the monthly $30 servicing fee to Plaintiff in any paperwork at any time, from the closing of the loan in 2008 to present day. Such a claim is wholly unmoored from any terms in the Deed; instead, it attacks Defendant's underlying policies and practices as a federal savings association. *See id.* at *5. Plaintiff "in essence asks [this Court] to impose new, substantive requirements on mortgage lenders." *McCauley*, 710 F.3d at 556. As such, this claim is preempted as arising out of state law which purports to impose requirements regarding

-19-

"[d]isclosure and advertising" under § 560.2(b)(9). Thus, Plaintiff's "breach of contract" claim that Defendant charged her a monthly $30 servicing fee which was not clearly disclosed is **DISMISSED**.

### ii.   Count II: Common Law Fraud & Intentional Misrepresentation

Count II alleges fraud and intentional misrepresentation by Defendant for 1) demanding that Plaintiff obtain excessive additional flood insurance and force-placing such insurance, 2) informing Plaintiff on multiple occasions that her flood insurance was for an inadequate amount and implying that she had an obligation to carry flood insurance in excess of the loan balance—which assertions Plaintiff relied upon to her detriment, in that she "determined that she could not afford flood insurance at the policy levels required by [] Defendant and became stuck with [] Defendant's forced placed flood insurance"—, 3) failing to adequately explain the monthly $30 servicing fee to Plaintiff, and 4) "fraudulently" threatening to foreclose on Plaintiff's property in two separate letters if Plaintiff failed to pay a vague "property charge" of $1,369.70. Compl. 8-9 ¶¶ 7-11 (2nd).

Plaintiff's first claim arises directly out of the terms of the Deed.[11] Though Plaintiff does not specify whether the ultimately force-placed flood insurance was "excessive" under substantive law or under the terms of her contract, a review of the factual background within the Complaint shows that Plaintiff believes the force-placed flood insurance to be excessive according to the terms of her contract, and as outlined above, such contract-based claims are not preempted under HOLA.[12]

---

[11] Whether this claim properly alleges fraud or intentional misrepresentation is dealt with below.

[12] In support of one of her WVCCPA claims, Plaintiff later states that she believes Defendant also misstated the amount of flood insurance required under federal law and under Defendant's own policies. *See* Compl. 10 ¶ 14(b) (2nd). However, this assertion is not included in Plaintiff's fraud claims, and throughout the factual background section of the Complaint, federal law and Defendant's own policies appear only to be pertinent to the determination of whether Defendant violated the terms of the Deed.

Plaintiff's second claim alleges fraud or intentional misrepresentation by Defendant. As recently clarified by the Fourth Circuit, fraud claims are not preempted under HOLA because they allege affirmative deception—not the violation of any state law preempted under § 560.2(b). *McCauley*, 710 F.3d at 557; *see also* OTS Op. Letter, Preemption of State Laws Applicable to Credit Card Transactions, 1996 WL 767462, at *5 (Dec. 24, 1996) ("State laws prohibiting deceptive acts and practices in the course of commerce are not included in the illustrative list of preempted laws in § 560.2(b)."). Such claims focus upon the particular fraudulent acts at bar; as a result, they do not change the regulatory landscape. *See McCauley*, 710 F.3d at 558; *see also* OTS Op. Letter, 1996 WL 767462, at *5 ("In fact, because federal [savings associations] are presumed to interact with their borrowers in a truthful manner[,] [a] general prohibition on deception should have no measurable impact on their lending operations."). Thus, per *McCauley*, this claim is not preempted under HOLA.

Plaintiff's third "fraud and intentional misrepresentation" claim alleges that Defendant failed to adequately explain the monthly $30 servicing fee to her. Once again, Plaintiff is actually alleging that Defendant failed to adequately *disclose* the $30 fee to her. This claim is preempted as arising out of state law which purports to impose requirements regarding "[d]isclosure and advertising" under § 560.2(b)(9). Thus, this claim is **DISMISSED**.

Plaintiff's fourth fraud and intentional misrepresentation claim alleges that Defendant "fraudulently" threatened to foreclose on Plaintiff's property in two separate letters if Plaintiff failed to pay a vague "property charge" of $1,369.70. Plaintiff is again alleging affirmative deceptions by Defendant, which claims, as explained above, are not preempted by HOLA.

-21-

### iii.  Count III: Violations of the WVCCPA

Count III alleges violations of the WVCCPA by Defendant for 1) misleading Plaintiff in multiple letters by stating that her flood insurance was inadequate, 2) implying to Plaintiff that she was required under company regulations and federal law to purchase additional flood insurance, 3) failing to adequately disclose to Plaintiff the reasoning for and amount of the monthly servicing fee and how it would be charged to her account, 4) twice threatening to foreclose on Plaintiff's property if she did not pay the "property charge" of $1,369.70, 5) charging Plaintiff for flood insurance which was of no practical value to her, 6) requiring flood insurance which was not reasonably related to the existing hazard or risk of loss or to the terms of credit provided to Plaintiff by Defendant, and 7) not allowing Plaintiff to choose the flood insurance provider.

Plaintiff alleges her first four WVCCPA claims to be violations of West Virginia Code §§ 46A-6-104 and -102(L) and (M). Section 46A-6-104 states, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Section 46A-6-102 clarifies, "'Unfair methods of competition and unfair or deceptive acts or practices' means and includes . . . (L) [e]ngaging in any . . . conduct [other than that outlined in subsections (A) through (K)] which similarly creates a likelihood of confusion or of misunderstanding; [or] (M) [t]he act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."

Setting aside the issue of whether Plaintiff's claims properly allege violations of these sections, it is apparent that, for claims one, two, and four, she is merely using the WVCCPA as a

means of obtaining a remedy for affirmative deceptive behavior. *Cf. Bishop*, 2010 WL 4115463, at *6-7 (finding claims under the WVCCPA which merely sought a remedy for breach of contract—a type of claim not preempted under HOLA when alleged directly—to also not be preempted under HOLA). As explained above, state laws regulating deceptive behavior are not preempted under HOLA. Thus, WVCCPA claims one, two, and four are not preempted.

Plaintiff's third WVCCPA claim asserts omissions by Defendant in its disclosures to Plaintiff. The key issue of whether such omissions were in any way wrongful cannot be decided under state law because § 560.2(b)(9) preempts state laws which purport to impose requirements regarding "[d]isclosure and advertising." Thus, Plaintiff's WVCCPA claim that Defendant failed to adequately disclose the reasoning for and amount of the monthly servicing fee and how it would be charged to her account is **DISMISSED**.

Plaintiff's fifth WVCCPA claim alleges that Defendant charged Plaintiff for flood insurance which was of no practical value to her in violation of § 46A-3-109(a)(4), which states, in pertinent part, "[A] creditor may contract for and receive . . . in connection with a consumer credit sale or a consumer loan . . . [c]harges for other benefits, including insurance, conferred on the consumer, if the benefits are of value to him or her . . . ." This claim is clearly preempted as arising out of a state law which purports to impose requirements regarding 1) "[t]he ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements" under § 560.2(b)(2) and 2) "[s]ecurity property" under § 560.2(b)(7). Thus, Plaintiff's fifth WVCCPA claim is **DISMISSED**.

Plaintiff's sixth WVCCPA claim alleges that Defendant required flood insurance which was not reasonably related to the existing hazard or risk of loss or to the terms of credit provided to her by Defendant in violation of § 46A-3-109(b)(1), which states, in pertinent part,

> The amount, terms and conditions of property insurance shall have a reasonable relation to the existing hazards or risk of loss, damage or destruction and be reasonable in relation to the character and value of the property insured or to be insured; and the term of the insurance shall be reasonable in relation to the terms of credit.

Again, this claim is clearly preempted as arising out of a state law which purports to impose requirements regarding 1) "[t]he ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements" under § 560.2(b)(2) and 2) "[s]ecurity property" under § 560.2(b)(7). Thus, Plaintiff's sixth WVCCPA claim is **DISMISSED**.

Plaintiff's seventh WVCCPA claim alleges that Defendant violated § 46A-3-109(b)(4) by providing misleading and unclear statements of how much flood insurance was required and by not allowing Plaintiff to choose the flood insurance provider. Section 46A-3-109(b)(4) states, in pertinent part,

> With respect to insurance against loss of or damage to property or against liability, the creditor shall furnish a clear and specific statement in writing to the debtor setting forth the cost of the insurance if obtained from or through the creditor and stating that the debtor may choose the person through whom the insurance is to be obtained . . . .

This claim is also clearly preempted as arising out of state law which purports to impose requirements regarding 1) "[t]he ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements" under § 560.2(b)(2), 2) "[s]ecurity property" under § 560.2(b)(7), and 3) "[d]isclosure and advertising" under § 560.2(b)(9). Thus, Plaintiff's seventh WVCCPA claim is **DISMISSED**.

### iv.  Count IV: Intentional Infliction of Emotional Distress

Count IV alleges intentional infliction of emotional distress (IIED) by Defendant for 1) willfully and intentionally misleading Plaintiff regarding the amount of flood insurance she

needed, 2) force-placing excessive flood insurance on Plaintiff's residence, costing her thousands of dollars in equity, 3) implying that federal law required Defendant to force-place such excessive insurance, and 4) twice threatening to foreclose on Plaintiff's property if she did not pay the vague "property charge" of $1,369.70.

Plaintiff's first, third, and fourth IIED claims allege affirmative deceptions by Defendant. Plaintiff's second IIED claim is based, in essence, on an alleged violation of the terms of the Deed. As outlined above, both breach of contract claims and claims of affirmative deception are not preempted under HOLA. Thus, none of Plaintiff's IIED claims are preempted.

### v.   Count V: Negligence & Reckless or Negligent Misrepresentation

Count V alleges negligence or reckless or negligent misrepresentation by Defendant for 1) failing to train, supervise, monitor, or otherwise control its employees a) to ensure that they did not violate the WVCCPA and b) to ensure that their flood insurance policies were in compliance with the terms of the Deed of Trust and federal law; 2) representing to Plaintiff that she was not in compliance with federal regulations and her contractual agreement with Defendant because of her flood insurance policy; and 3) recklessly or negligently threatening to foreclose on Plaintiff's property, twice, if she did not pay the vague "property charge" of $1,369.70.

Plaintiff's first negligence claim converts what would otherwise be a mere tort claim into a high-level attack on Defendant's internal training policies regarding servicing of a loan and the placement of flood insurance on collateral. Thus, this claim is preempted as arising out of a state law which purports to impose requirements regarding 1) "[t]he ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements" under § 560.2(b)(2), 2) "[s]ecurity property" under § 560.2(b)(7), and 3) "[p]rocessing,

origination, servicing, sale or purchase of, or investment or participation in, mortgages" under § 560.2(b)(10). Thus, Plaintiff's first negligence claim is **DISMISSED**.

Plaintiff's final two negligence claims allege reckless or negligent misrepresentations by Defendant. Just as a state's general prohibition on deception does not fall under any of the preempted types of laws listed under § 560.2(b), neither does a state's general prohibition on affirmative reckless or negligent misrepresentations. Such law "relates to the standards to which a lender dealing with a potential borrower will be held[,] [and] [a]s such, it clearly affects lending, giving rise to a presumption that it is preempted." *McCauley*, 710 F.3d at 557. However, "OTS . . . does not intend to preempt state laws that establish the basic norms that undergird commercial transactions[,] [and] [a]ccordingly, in § 560.2(c), [it] has identified certain categories of state law that are not preempted." OTS Op. Letter, 1996 WL 767462, at *5. "Tort law" is one such category, and reckless or negligent misrepresentation is a tort claim. Reckless or negligent misrepresentation claims would only incidentally affect the lending operations of federal savings associations since lending institutions can easily avoid making affirmative misrepresentations through the simple due diligence that is expected of all commercial enterprises. Finally, these claims are consistent with the purposes of § 560.2(a) in that "[t]here is no indication that the law is aimed at any state objective in conflict with the safe and sound regulation of federal savings associations, the best practices of thrift institutions in the United States, or any other federal objective identified in § 560.2(a)." OTS Op. Letter, 1996 WL 767462, at *6. Thus, Plaintiff's reckless or negligent misrepresentation claims that Defendant represented to Plaintiff that she was not in compliance with federal regulations and her contractual agreement with Defendant because of her flood insurance policy and threatened to foreclose on Plaintiff's property, twice, if she did not pay the vague "property charge" of $1,369.70 are not preempted under HOLA.

### c.  Failure to State a Claim

Defendant also argues, in the alternative, that any claims which are not preempted under HOLA otherwise fail to state a claim under which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court will review each of the remaining claims in turn.

### i.  Count I: Breach of Contract

Plaintiff's remaining breach of contract claim alleges that Defendant required Plaintiff to get flood insurance in excess of what was required under the Deed,[13] force-placed such insurance, and charged the cost to Plaintiff. Defendant contends that Plaintiff cannot and does not assert sufficient facts which plausibly give rise to an entitlement to relief because the Deed allows Defendant to force-place insurance and charge it to Plaintiff in the amounts Defendant did. Thus, there was no breach. As discussed in detail above, this Court may consider the Deed in its resolution of the instant Motion to Dismiss, and in the instance of any conflict between the Deed and the Complaint, the Deed controls.

The Deed of Trust requires Plaintiff to "pay all property charges consisting of . . . flood . . . insurance premiums . . . and . . . provide evidence of payment to [Defendant], unless [Defendant] pays property charges . . . by charging such payments to a line of credit as provided for in the Loan Agreement." Deed of Trust 2 ¶ 2. The Deed also states that "if [Plaintiff] fails to make these payments or the property charges [sic] required by Paragraph 2, . . . [Defendant] may do and pay whatever is necessary to protect the value of the Property and [Defendant's] rights in the Property, including payment of . . . hazard insurance and other items mentioned in Paragraph 2." *Id.* at 3 ¶ 5. Additionally, "[a]ny amounts disbursed by [Defendant] under this Paragraph shall become an

---

[13]  It is apparent from the briefing that when the parties refer to the "Deed," they are referring to the First Deed of Trust referenced in the Complaint.

additional debt of [Plaintiff] as provided for in the Loan Agreement and shall be secured by [the Deed]." *Id.* at 3 ¶ 5.

The Deed requires Plaintiff to "insure all improvements on the Property . . . against any hazards, casualties, and contingencies, including fire . . . in the amounts, to the extent and for the periods required by [Defendant] or the Secretary of [HUD] ("Secretary")." *Id.* at 2 ¶ 3. The immediately following sentence states, "[Plaintiff] shall also insure all improvements on the Property . . . against loss by floods to the extent required by the Secretary." *Id.* Finally, "All insurance shall be carried with companies approved by [Defendant]." *Id.*

The key flood insurance regulation promulgated by HUD, 24 C.F.R. § 203.16a(a), states, "If the mortgage is to cover property improvements . . . that . . . are located in an area designated by the Federal Emergency Management Agency (FEMA) as a floodplain area having special flood hazards, or . . . [a]re otherwise determined by the Commissioner to be subject to a flood hazard, and if flood insurance under the National Flood Insurance Program (NFIP) is available with respect to these property improvements, the mortgagor and mortgagee shall be obligated, by a special condition to be included in the mortgage commitment, to obtain and to maintain NFIP flood insurance coverage on the property improvements during such time as the mortgage is insured." Section 203.16a(c) clarifies that this flood insurance "must be maintained during such time as the mortgage is insured in an amount at least equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvements, whichever is less."

Additionally, according to the Complaint, there is a Second Deed of Trust—benefitting HUD—which states, under the label "Fire, Flood and Other Hazard Insurance," that Plaintiff

"shall insure all improvements on the Property, whether now in existence of [sic] subsequently erected, against loss by floods to the extent required by the lender." Compl. ¶ 8.

Defendant maintains that the Deed[14] and § 203.16a(a) both allow it to set the flood insurance coverage at any amount, including the amounts actually set by Defendant, and that if Plaintiff fails to procure flood insurance of at least the amount set by Defendant, it can force-place the insurance at that amount and charge the cost of that insurance to Plaintiff. Defendant argues several interrelated points. First, it argues that the controlling line of the contract is the requirement that Plaintiff "insure all improvements on the Property . . . against any hazards, casualties, and contingencies, including fire . . . in the amounts, to the extent and for the periods required by [Defendant] or the Secretary." Per Defendant, flood insurance is a type of hazard insurance, and thus, Defendant can require flood insurance coverage in an amount higher than that which would be required by the Secretary of HUD. Defendant argues that the next sentence in the Deed—"[Plaintiff] shall also insure all improvements on the Property . . . against loss by floods to the extent required by the Secretary."—merely clarifies that, for flood insurance, the coverage Plaintiff must carry will be at least that required by HUD, thus setting a lower limit on the amount of flood insurance which Defendant can require. Further, Defendant points out that, through § 203.16a(c), HUD requires flood insurance "in an amount *at least* equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available;" thus, HUD's requirements allow for Defendant to set the flood insurance coverage requirement at any amount, merely providing a floor, not a ceiling.

Plaintiff maintains that the Deed does not allow Defendant to set the amount of flood insurance that Plaintiff must maintain on her property; instead, such amount is set exclusively by the Secretary of HUD, as detailed in the Deed through the sentence "[Plaintiff] shall also insure all

---

[14] Oddly enough, both parties ignore the Second Deed of Trust in their briefing.

improvements on the Property . . . against loss by floods to the extent required by the Secretary." Plaintiff then points out that Defendant's interpretation of § 203.16a(c) is flawed in that it ignores the final three words of the operative sentence. The full sentence reads, "[F]lood insurance must be maintained during such time as the mortgage is insured in an amount at least equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvements, *whichever is less*." Thus, the requirement set by HUD is the *lesser* of either the maximum amount of the NFIP insurance available or the outstanding balance of the mortgage, less estimated land costs. In Plaintiff's case, the latter is clearly the lesser of the two options.[15] Thus, Defendant has been requiring far more flood insurance coverage of Plaintiff than that which her Deed allows.

First, it is apparent to the Court that Plaintiff's interpretation of § 203.16a(c) is correct. Per § 203.16a(c), HUD gives two options for determining the required amount of flood insurance for a covered property: either the maximum amount of the NFIP insurance available or the outstanding balance of the mortgage, less estimated land costs; however, the regulation is explicit in that it *requires* only the one option which results in the *least* flood insurance coverage. Defendant is correct that § 203.16a(c) does not create a ceiling upon the amount of flood insurance which may be placed on a property to which § 203.16a applies; however, this *allowance* of higher amounts by HUD does not translate into a *requirement* of higher amounts.

The First Deed is less clear. Even the first sentence, standing alone, is ambiguous; if Plaintiff must carry hazard insurance in an amount as required by Defendant *or* HUD, in the event of a difference between the amounts required by each—as here—which controls? The next sentence, specific to flood insurance, is much clearer and supports Plaintiff's claim: "[Plaintiff]

---

[15] The Complaint quotes an April 6, 2010, letter from Defendant which states that the "the maximum available coverage under the National Flood Insurance Program (NFIP) . . . [is] currently $250,000 for residential properties in participating communities." Compl. ¶ 16.

shall also insure all improvements on the Property . . . against loss by floods *to the extent required by the Secretary*"—not to the extent required by Defendant.

Seriously compounding the confusion is the Second Deed of Trust, which was ignored by both parties in their briefing. It appears to be a contract between at least HUD and Plaintiff, and it is unclear what Defendant's rights may be under the Second Deed. Further it is unclear whether the Secretary of HUD's "requirements" under the First Deed are dictated by § 203.16a(c) or by the Second Deed or by both in combination. It is also unclear how the words "to the extent required by the lender" in the Second Deed are modified by the First Deed, since the lender presumably drafted the First Deed. However, the ambiguity in the operative contracts between the parties need not be fully resolved by the Court at this time. *See Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005) (stating that, at the motion to dismiss stage, a court "should resolve any contractual ambiguities in favor of the plaintiff").

The Complaint alleges that, in 2008, Plaintiff borrowed $41,818 from Defendant. It further alleges that, in April 2010, Defendant demanded that Plaintiff procure $149,900 in flood insurance beyond the coverage she already maintained of $101,000 and that, in March 2010, Defendant had already force-placed $100,000 in supplemental flood insurance on Plaintiff's property and charged the premium to Plaintiff's line of credit. It also alleges that, in April 2011, when Plaintiff's outstanding mortgage balance was $76,126.42, Defendant force-placed $181,000 of insurance on the property and charged the premium to Plaintiff. The Complaint further alleges that, in March 2012, Defendant force-placed $91,000 of insurance on the property and charged the premium to Plaintiff and then, in April 2012, Defendant force-placed $182,000 of insurance on the property and charged the premium to Plaintiff. The Complaint also alleges that, in June 2012, the outstanding mortgage balance was $78,248.60. It further alleges that, in July 2013, Plaintiff had

$84,000 in flood insurance and then Defendant informed her that she needed another $100,000 in flood insurance beyond this amount. The Complaint also alleges that the outstanding balance of the reverse mortgage as of May 2013 was $83,904.48.

It is clear that, given the facts that Plaintiff alleges and the ambiguity in and between the Deeds, Plaintiff has alleged sufficient facts to state a claim for relief that is plausible on its face. Taking the allegations in the Complaint to be true and resolving all contractual ambiguities in Plaintiff's favor, in this instance, the Deeds require flood insurance on Plaintiff's property in an amount equal to the outstanding balance of the mortgage, less estimated land costs. The highest outstanding balance throughout the period of activity in the Complaint was just under $84,000; thus, each instance of Defendant force-placing insurance in an amount beyond this limit and charging the cost of such insurance to Plaintiff was plausibly in breach of the parties' contract.

### ii.  Count II: Fraud & Intentional Misrepresentation

Plaintiff's remaining fraud and intentional misrepresentation claims allege that Defendant 1) demanded that Plaintiff obtain excessive additional flood insurance and then force-placed such insurance, 2) informed Plaintiff on multiple occasions that her flood insurance was for an inadequate amount, implying that she had an obligation to carry flood insurance in excess of the loan balance—which assertions Plaintiff relied upon to her detriment, in that she "determined that she could not afford flood insurance at the policy levels required by [] Defendant and became stuck with [] Defendant's forced placed flood insurance"—, and 3) "fraudulently" threatened to foreclose on Plaintiff's property in two separate letters if Plaintiff failed to pay a vague "property charge" of $1,369.70.

The West Virginia Supreme Court of Appeals treats a claim for "intentional misrepresentation" as a fraud claim, so this Court will do so as well. *See, e.g.*, *Gaddy Eng'g Co. v.*

*Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 576 (W. Va. 2013) ("Actionable fraud must ordinarily be predicated upon an intentional misrepresentation of a past or existing fact and not upon a misrepresentation as to a future occurrence." (emphasis removed) (internal quotation marks omitted)). Under West Virginia law, the essential elements of a fraud claim are "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; (3) that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (4) that he was damaged because he relied upon it." *Bowens v. Allied Warehousing Servs., Inc.*, 729 S.E.2d 845, 852 (W. Va. 2012) (brackets omitted).

There are multiple issues with Plaintiff's fraud claims. First, the first and third claims above do not even attempt to allege reliance—that Plaintiff took action or omitted to act based upon Defendant's "misrepresentations"—, let alone damages from such reliance. *See Pocahontas Min. Co. Ltd. P'ship v. Oxy USA, Inc.*, 503 S.E.2d 258, 264 (1998) (Workman, J., concurring). Secondly, all of Plaintiff's fraud claims are "simply breach of contract claims masquerading as fraud claims." *Gaddy Engineering*, 746 S.E.2d at 577. As the West Virginia Supreme Court of Appeals recently clarified,

> In seeking to prevent the recasting of a contract claim as a tort claim, courts often apply the "gist of the action" doctrine. Under this doctrine, recovery in tort will be barred when any of the following factors is demonstrated:
>
> > (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Id.* Here, all of Plaintiff's remaining fraud claims clearly fulfill the final three "gist of the action" factors, and in order to dismiss such a claim, only one such factor needs to be demonstrated. Most obviously, all three fraud claims are dependent upon the success of the breach of contract claim. If

Defendant prevails upon the contract claim, then none of the representations of which Plaintiff here complains were "false." Thus, all of Plaintiff's remaining fraud and intentional misrepresentation claims are **DISMISSED** for failure to state claims upon which relief can be granted.

### iii.   Count III: Violations of the WVCCPA

Plaintiff's remaining WVCCPA-violation claims allege that Defendant violated West Virginia Code §§ 46A-6-104 and -102(L) and (M) by 1) misleading Plaintiff in multiple letters by stating that her flood insurance was inadequate, 2) implying to Plaintiff that she was required under company regulations and federal law to purchase additional flood insurance, and 3) twice threatening to foreclose on Plaintiff's property if she did not pay the "property charge" of $1,369.70. As discussed in detail above, this Court may consider Plaintiff's Exhibits 6, 7, 27, and 28 in resolving the instant Motion to Dismiss, and in the instance of any conflict between the exhibits and the Complaint, the exhibits control. Exhibits 6 and 7 are pertinent to the Court's discussion of WVCCPA claims one and two, and Exhibits 27 and 28 are pertinent to the Court's discussion of remaining WVCCPA claim three.

Section 46A-6-104 states, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Section 46A-6-102 clarifies, "'Unfair methods of competition and unfair or deceptive acts or practices' means and includes . . . (L) [e]ngaging in any . . . conduct [other than that outlined in subsections (A) through (K)] which similarly creates a likelihood of confusion or of misunderstanding; [or] (M) [t]he act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with

-34-

the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."

Section 46A-6-102(M) cannot apply to this case because the actions listed in this section must be done "in connection with the *sale or advertisement* of any goods or services." Defendant's alleged actions could not be categorized as either attempted sales or advertisements. Instead, as outlined in the Complaint, Defendant was attempting to force Plaintiff to increase her own insurance coverage, and when she did not do so, Defendant force-placed such additional insurance. Later, Defendant threatened to foreclose on Plaintiff's property if she did not pay a property charge. Plaintiff nowhere alleges any advertisement or sale of goods or services in Defendant's communications.[16] Thus, all claims made under § 46A-6-102(M) are **DISMISSED**.

Section 46A-6-104, in connection with § 46A-6-102(L), prohibits engaging in any conduct which creates a likelihood of confusion or of misunderstanding in the conduct of any trade or commerce.

Plaintiff's first WVCCPA claim alleges that Defendant violated these statutes by misleading Plaintiff, through multiple letters, that her flood insurance was inadequate. Given that Plaintiff's second claim explicitly speaks to Defendant's assertions regarding its own regulations and federal law, this first claim appears to relate solely to Defendant's assertions regarding the meaning of the Deeds. This claim suffers from the same problem as Plaintiff's fraud claims: in order for Plaintiff to prevail in showing that Defendant's communications created confusion or misunderstanding, she must prevail on her breach of contract claim. If Defendant prevails, there was no confusion or misunderstanding created by its communications with Plaintiff regarding the

---

[16] In fact, in one such communication, a letter from Defendant dated July 16, 2013, Defendant states in all capital letters: "Notice: If we must obtain lender-placed flood coverage for you because of your failure to forward evidence of adequate flood insurance, the cost of this lender-placed flood insurance may be significantly higher than the cost of insurance purchased through your own agent or company." Pl.'s Ex. 6 at 2.

Deed; instead, Defendant was simply correct. This is precisely the duplication of claims which the "gist of the action" doctrine seeks to prevent, and as explained in the HOLA preemption section of this Opinion, through this claim, Plaintiff is merely gaining a remedy for a tort claim through the WVCCPA. Most importantly, given the ambiguity in the underlying Deeds, it stretches credulity to say that Defendant's communications with Plaintiff regarding its interpretation of the Deeds qualify as conduct which creates a likelihood of confusion or misunderstanding; any confusion or misunderstanding was caused by the underlying Deeds, not Defendant's conduct. Thus, the Court simply cannot find that Plaintiff has alleged sufficient facts in support of her first WVCCPA claim to plausibly give rise to an entitlement to relief. Plaintiff's claim that Defendant violated West Virginia Code §§ 46A-6-104 and -102(L) by misleading Plaintiff, through multiple letters, that her flood insurance was inadequate is **DISMISSED**.

Plaintiff's second WVCCPA claim alleges that Defendant violated these statutes by implying to Plaintiff that she was required under company regulations and federal law to purchase additional flood insurance. Plaintiff's Exhibit 7 is comprised of the first two pages of a letter dated July 7, 2013, which Defendant addressed to Plaintiff. It states,

> Your mortgage documents and federal law authorize us to require that adequate flood insurance be maintained with respect to all outstanding loans secured by improved property located in a Special Flood Hazard Area (SFHA) . . . . Your property is located in an SFHA, so the terms of your mortgage and federal law require you to purchase adequate flood insurance. Our records show that we have not received proof that adequate flood insurance is in force on your property. As a result, . . . we will purchase the additional flood insurance (lender-placed insurance) required and charge you for the cost of the insurance. To maintain adequate insurance, we require that your flood insurance coverage is in an amount at least equal to the lesser of:, [sic] (i) the last known amount of homeowners insurance (Coverage A) that you purchased or (ii) the maximum available coverage under the National Flood Insurance Program (NFIP), [sic] (currently $250,000 for residential properties in participating communities). . . . If we do not hear from you, we are authorized to obtain the additional flood insurance coverage for you. . . . [T]his insurance will provide protection for loss of your dwelling up to $100,000.

Pl.'s Ex. 7 at 1-2. Plaintiff's Exhibit 6, another letter from Defendant to Plaintiff, dated July 13, 2013, also includes, word for word, the above quoted material. Additionally, the Complaint quotes a letter from Defendant, dated April 6, 2010, which duplicates, word for word, the first four sentences above and then states:

> Coverage must be in an amount that is at least equal to, (i) the last known amount of homeowners insurance (Coverage A) that you purchased or (ii) the maximum available coverage under the National Flood Insurance Program (NFIP), (currently $250,000 for residential properties in participating communities), whichever is lowest.

Compl. ¶ 16. The Complaint further alleges that this 2010 letter informed Plaintiff that she needed an additional $149,900 in flood insurance.

As explained above, "federal law"—through 24 C.F.R. § 203.16a(a)—requires flood insurance coverage "in an amount at least equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvements, *whichever is less*." The highest outstanding balance throughout the period of activity in the Complaint was just under $84,000; thus, insurance coverage of $100,000 and $149,900 is beyond that which federal law requires. It is plausible to this Court that the above communications from Defendant would create a likelihood of confusion or of misunderstanding regarding what amount of flood insurance coverage is required by federal law.

Further, the Complaint alleges that, apparently in 2011 or 2012, in a response letter to the Attorney General, V. Lyn Niles, Vice President of Loan Administration for Defendant Financial Freedom, stated:

> We recently updated our flood policy to accept coverage for the lesser of the improved value (i.e., the dwelling(s)) of the property based on the appraisal or the maximum allowed by the National Flood Insurance program. As such, the minimum flood coverage amount required is now $91,000 (appraised value of $111,000 less a site (land) value of $20,000).

Compl. ¶ 23. The Complaint also alleges that Defendant wrote a response to Plaintiff's counsel on July 12, 2013, stating that Plaintiff's flood insurance coverage for $84,000 was acceptable and that she could ignore the above letter from July 7, 2013, requesting an additional $100,000 in flood insurance. However, the July 13, 2013, letter—identical to the July 7, 2013, letter—was received after this July 12, 2013, letter. Thus, it is apparent from Plaintiff's allegations and the two July 2013 letters that Defendant engaged in conduct which created a likelihood of confusion or of misunderstanding regarding whether or not its internal regulations required the amount of flood insurance Defendant was force-placing on Plaintiff's property. Indeed, the Court remains confused as to what Defendant's policies in this regard actually were. Thus, Plaintiff plausibly alleges a claim for relief under West Virginia Code §§ 46A-6-104 and -102(L) in regard to Defendant's communications to Plaintiff that she was required under company regulations and federal law to purchase additional flood insurance.

Plaintiff's third WVCCPA claim alleges that Defendant violated these statutes by twice threatening to foreclose on Plaintiff's property if she did not pay the "property charge" of $1,369.70. Plaintiff's Exhibit 27 is a letter from Defendant to Plaintiff, dated March 27, 2013, and entitled "Repayment Agreement," which states,

> Your reverse mortgage loan is suspended and in default status . . . . Failure to cure the repayment amount set forth below or failure to pay future property taxes, insurance premiums, and/or homeowner's association dues (known as "property charges") when they become due could result in Financial Freedom declaring your reverse mortgage loan due and payable. If the default remains unresolved, this may result in the initiation of proceedings to foreclose and ultimately the loss of your home. . . . As stated in your reverse mortgage loan documents, you must pay your property charges timely. Your failure to do so has resulted in Financial Freedom advancing funds on your behalf, which must be repaid. The total repayment amount of $1369.70 is calculated based on the actual disbursement amount of property charges, less any available line of credit balance at the time of the disbursement(s) and any repayments received to date. . . . For further guidance, we strongly encourage you to contact one of the Housing Counseling Agencies on the enclosed list. One of these counselors may be able to provide you with information about

agencies in your area that could be of assistance to you in understanding your liability for these expenses as well as options for repayment. Please provide a copy of this letter at the time of your counseling session.

Pl.'s Ex. 27 at 1. Plaintiff's Exhibit 28, a letter from Defendant to Plaintiff, dated May 27, 2013, is nearly identical to Exhibit 27. Considering that the "property charge" "total repayment amount" of $1369.70 is never itemized or explained in this letter—and the Complaint alleges no further communications which do, so the Court cannot assume that there were any—, Plaintiff asserts sufficient facts that, in the conduct of its business, Defendant engaged in conduct which created a likelihood of confusion or of misunderstanding in violation of §§ 46A-6-104 and -102(L). Thus, Plaintiff's claim that Defendant twice threatened to foreclose on Plaintiff's property if she did not pay the "property charge" of $1,369.70, in contravention of these statutes, plausibly gives rise to an entitlement to relief.

### iv.   Count IV: Intentional Infliction of Emotional Distress

Plaintiff's IIED claims allege that Defendant 1) willfully and intentionally misled Plaintiff regarding the amount of flood insurance she needed, 2) force-placed excessive flood insurance on Plaintiff's residence, costing her thousands of dollars in equity, 3) implied that federal law required Defendant to force-place such excessive insurance, and 4) twice threatened to foreclose on Plaintiff's property if she did not pay the vague "property charge" of $1,369.70.

In order for Plaintiff to prevail on her IIED claim, she must show:

(1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, Syl. Pt. 3 (W. Va. 1998).

-39-

Plaintiff's first two IIED claims are simply breach of contract claims masquerading as tort claims. As a matter of law, no reasonable jury could find that Defendant "misled" Plaintiff or that its force-placing of insurance was so extreme and outrageous as to exceed the bounds of decency if Defendant prevails on the underlying breach of contract claim. *See id.* at 427 ("It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." (internal quotation marks omitted)). Thus, Plaintiff's first two IIED claims must be **DISMISSED** because, for each, the success of the tort claim is dependent upon the success of the breach of contract claim.

Plaintiff's final two IIED claims also fail because no reasonable jury could find Defendant's alleged conduct so extreme and outrageous as to exceed the bounds of decency. Regarding this element of an IIED claim, the West Virginia Supreme Court of Appeals has clarified,

> The defendant's conduct must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct. . . . It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language,, [sic] and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Id.* at 425 (internal quotation marks omitted).

Plaintiff's own wording of her third IIED claim reveals the problem with it: "Defendant *implied* that federal law required them to force place excessively high flood insurance, despite the Plaintiff having adequate flood insurance." Compl. 11 ¶ 20(c) (2nd) (emphasis added). Whether Plaintiff in fact had adequate flood insurance is the subject of her as-yet-unresolved breach of contract claim, thus it is improper subject matter for her IIED claim. Further, no average member of the community would exclaim, "Outrageous!" at such an implication by Defendant. Thus, Plaintiff's third IIED claim must be **DISMISSED**.

Regarding Plaintiff's fourth IIED claim, though threatening to foreclose upon someone's house may very well be considered extreme and outrageous behavior in certain circumstances, such circumstances do not exist here. Whether Defendant properly threatened to foreclose upon Plaintiff's house for non-payment of "property charges" is not a proper IIED claim because it is truly a contract claim pretending to be a tort claim. Thus, Plaintiff is left with a claim that Defendant merely did not adequately identify the "property charge" for nonpayment of which it threatened to foreclose upon Plaintiff's property. Though it would no doubt be vexing to receive such a nonspecific letter, again, the Court cannot imagine any average community member exclaiming, "Outrageous!" upon hearing of this omission. Thus, all of Plaintiff's IIED claims must be **DISMISSED** for failure to state claims upon which relief can be granted.

### v.  Count V: Negligence & Reckless or Negligent Misrepresentation

Plaintiff's remaining negligence or reckless or negligent misrepresentation claims allege that Defendant 1) represented to Plaintiff that she was not in compliance with federal regulations and her contractual agreement with Defendant because of her flood insurance policy and 2) recklessly or negligently threatened to foreclose on Plaintiff's property, twice, if she did not pay the "property charge" of $1,369.70.

-41-

"To prevail in a negligence suit, the plaintiff must prove by a preponderance of the evidence that the defendant owed a legal duty to the plaintiff and that by breaching that duty the defendant proximately caused the injuries of the plaintiff." *Strahin v. Cleavenger*, 603 S.E.2d 197, 205 (W. Va. 2004).

Plaintiff's second negligence claim and the portion of Plaintiff's first negligence claim which alleges that Defendant represented to Plaintiff that she was not in compliance with the parties' contractual agreement because of her flood insurance policy cannot continue because, like her fraud claims, they are truly contract claims masquerading as tort claims. Thus, they are **DISMISSED**.

The remaining portion of Plaintiff's first negligence claim—which alleges that Defendant represented to Plaintiff that she was not in compliance with federal regulations because of her flood insurance policy—is also improper because Plaintiff has not plausibly alleged a special relationship between Defendant and her such that Defendant owed her a duty in this instance:

> Under West Virginia law, a plaintiff cannot maintain a[] [negligence] action . . . for an alleged breach of a contractual duty. A legal duty, however, may arise from a special relationship between the parties. The existence of a special relationship will be determined largely by the extent to which the particular plaintiff is affected differently from society in general.
>
> In the lender-borrower context, a special relationship may exist where a lender performs services not normally provided by a lender to a borrower. The possession of information unique to the lender can also indicate a special relationship.

*O'Brien v. Quicken Loans, Inc.*, No. 2:12-CV-5138, 2013 WL 2319248, at *10 (S.D. W. Va. May 28, 2013) (citations omitted) (internal quotation marks omitted). Such a duty also must be also proven to support a reckless or negligent misrepresentation claim. *See Folio v. City of Clarksburg*, 655 S.E.2d 143, 151 (W. Va. 2007) ("One under a duty to give information to another, who makes an erroneous statement when he has no knowledge on the subject, and thereby misleads the other

to his injury, is as much liable in law as if he had intentionally stated a falsehood." (internal quotation marks omitted)); *Kidd v. Mull*, 595 S.E.2d 308, 317 (W. Va. 2004) ("[A] successful claim for negligent misrepresentation would require a finding that [the defendant] maintained a special relationship or duty to the [plaintiffs].". As was the case in *O'Brien*, the relationship Plaintiff outlines in the Complaint is that which is customary between a borrower and a lender. Defendant did not endeavor to perform uncustomary services for Plaintiff, possess information of unique relevance to Plaintiff in regard to this claim, or participate in any conduct which could arguably be seen as creating a special relationship with Plaintiff. Thus, all of Plaintiff's remaining negligence or reckless or negligent misrepresentation claims must be **DISMISSED** for failure to state claims upon which relief can be granted.

## IV.    Conclusion

As explained above, Defendant's Motion to Dismiss, ECF No. 12, is **GRANTED in part** and **DENIED in part**. Plaintiff's breach of contract claim that Defendant required Plaintiff to get flood insurance in excess of what was required under the Deed of Trust, force-placed such insurance, and charged the cost to Plaintiff survives this Motion to Dismiss. Plaintiff's WVCCPA claims that Defendant violated West Virginia Code §§ 46A-6-104 and -102(L) by 1) implying to Plaintiff that she was required under company regulations and federal law to purchase additional flood insurance and 2) twice threatening to foreclose on Plaintiff's property if she did not pay a "property charge" of $1,369.70 also survive this Motion to Dismiss. All other claims—including Plaintiff's other breach of contract claim, all of Plaintiff's fraud and intentional misrepresentation claims, all of Plaintiff's other WVCCPA claims, all of Plaintiff's intentional infliction of emotional distress claims, and all of Plaintiff's negligence or reckless or negligent misrepresentation claims—are **DISMISSED**.

Plaintiff's Motion Requesting Hearing on Defendant's Motion to Dismiss, ECF No. 26, is

**DENIED as moot**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel

of record and any unrepresented parties.

ENTER:          March 14, 2014

ROBERT C. CHAMBERS, CHIEF JUDGE

-44-